DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action No. 2021-0010 |
| ) | |
| MOISES FIGUEROA, JR., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
   *For the United States*

**Gabriel J. Villegas, Esq.,**
St. Croix, U.S.V.I.
   *For Defendant*

## MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Moises Figueroa, Jr.'s ("Defendant") "Motion to Suppress" (Dkt. No. 24), the Government's Opposition thereto (Dkt. No. 25), the evidence presented by the parties at the evidentiary hearing held on February 1, 2022, the Government's Supplemental Memorandum (Dkt. No. 38), and Defendant's Supplemental Memorandum (Dkt. No. 39). For the reasons discussed below, the Court will deny the Motion to Suppress.

### I.  BACKGROUND

On September 20, 2021, the Government filed a four-count Information (Dkt. No. 16) charging Defendant with: Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count I); Felon in Possession of Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count II); Possession of a Firearm on U.S. Postal Service Property in violation of

39 C.F.R. § 232.1(l), 18 U.S.C. § 3061(c)(4), and 39 U.S.C. § 401 (Count III); and Unauthorized Possession of a Firearm by a Convicted Felon in violation of 14 V.I.C. § 2253(a) (Count IV).

Defendant filed the instant Motion to Suppress on October 29, 2021. In his Motion, Defendant argues that he was searched and seized without a warrant in violation of the Fourth Amendment. (Dkt. No. 24 at 3-4). Defendant further argues that the evidence seized from his person and his subsequent statement must be suppressed as fruit of the poisonous tree. *Id.* at 1.

At the suppression hearing, the Government presented the testimony of Special Agent Bernhardt Simmonds, Postal Inspector Eric Oram, Special Agent Xavier Santiago, and Special Agent John Snowa. Defendant testified on his own behalf. The following facts emerged from the record established at the suppression hearing.[1]

The Government's first witness was Special Agent Bernhardt Simmonds of Homeland Security Investigations ("HSI"). Agent Simmonds testified that on May 21, 2021, he received a call from Customs and Border Protection ("CBP"). CBP informed Agent Simmonds that they had intercepted a package containing a firearm en route to a P.O. box at the Post Office in Frederiksted on St. Croix. Agent Simmonds proceeded to the CBP office at the Henry E. Rohlsen Airport where he viewed the parcel which contained a children's kitchen play set. Inside the play set were components of a firearm wrapped in carbon paper and tape, including a lower receiver, upper receiver, and a magazine. The parcel was addressed from Angel O'Neal, 1677 S Kirkman Road, Apartment 302, Orlando, Florida 32811 to Jose Guadelupe, P.O. Box 1642, Frederiksted, St. Croix 00841. Agent Simmonds then contacted the U.S. Attorney's Office to see if they would be willing

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but not conceded or proven beyond a reasonable doubt at this stage of the litigation.

2

to accept prosecution. He then contacted Postal Inspector Eric Oram to inform him that prosecution was accepted and that law enforcement would be able to conduct a controlled delivery. The parcel was then seized.

Agent Simmonds further testified that Inspector Oram informed him that another parcel was being sent to the same P.O. box. Then on May 24, 2021, Agent Simmonds received another call from CBP stating that they had found the second parcel and that it contained a firearm. Agent Simmonds observed this second parcel, which similarly contained a children's play set with a firearm. This second parcel was also addressed to Jose Guadelupe, P.O. Box 1642, Frederiksted, St. Croix 00841, but from Angel O'Neal, 1677 S Kirkman Road, Apartment 328. Agent Simmonds contacted Inspector Oram, confirming that the second parcel contained a firearm, and then seized the firearm.

Agent Simmonds testified that a controlled delivery of the parcels took place on May 26, 2021. At the briefing prior to the controlled delivery, federal agents were shown a picture of Defendant and his son (who has the same name as Defendant), based on the name connected to the P.O. box. In order to effectuate the controlled delivery, the firearms were removed from the two parcels for safety reasons. During the controlled delivery, Agent Simmonds and Inspector Oram were inside the rear of the Post Office and could view live video footage of the front counter area of the Post Office. On the video footage, Agent Simmonds saw an individual approach the counter, pick up both parcels, and exit the Post Office. Agent Simmonds relayed this information to the surveillance team outside of the Post Office. He then exited the rear of the Post Office, got into his vehicle and brought it around to the front of the building. When he arrived, Defendant was detained by other agents and the two parcels were next to Defendant. Agent Simmonds testified

that Agent Xavier Santiago handed him a firearm to "clear." After the firearm was secured, the agents placed Defendant in Agent Simmonds' vehicle and transported him to the HSI office.

The Government's second witness was Eric Oram of the United States Postal Inspection Service. Inspector Oram testified that he was contacted by Agent Simmonds on May 21, 2021, who informed him that a parcel was intercepted by CBP that contained a firearm. Inspector Oram then searched for the P.O. box application and for the sender and recipient names in public records databases. The search revealed that the P.O. box was registered to Moises Figueroa, Jr., but the name Jose Guadelupe was not associated with the sender address on the parcel. Inspector Oram discussed the possibility of conducting a controlled delivery of this parcel with Agent Simmonds. Inspector Oram then searched through the postal databases to determine whether any other parcels were sent to that P.O. box. He discovered that another parcel was mailed two days after the first parcel and that it was en route to the same P.O. box. Inspector Oram passed along that information to Agent Simmonds. When CBP seized the second parcel on May 24th, Agent Simmonds contacted Inspector Oram and sent him an email with photographs of the second parcel.

Inspector Oram testified that he and Agent Simmonds decided to perform a controlled delivery on May 26, 2021. After the briefing on May 26th, Inspector Oram went to the Frederiksted Post Office, where he worked with the postal employees so that the parcels were scanned to show that they were available for pickup and two pickup slips were written and placed in P.O. Box 1642. Inspector Oram also testified that he was watching a video feed of the Post Office when a person handed in the pickup slips for the two parcels and picked up the parcels. Inspector Oram and Agent Simmonds then collected their things and pulled up to the front of the Post Office, where Inspector Oram then observed Defendant outside of the front door of the Post Office in handcuffs with the two parcels next to him on the ground.

The Government's third witness was Special Agent Xavier Santiago of HSI, who participated in the controlled delivery on May 26, 2021. Agent Santiago testified that at the briefing, he was assigned to the surveillance/takedown team and was shown a photo of Defendant. When he arrived at the Frederiksted Post Office, Agent Santiago was stationed in a vehicle where he and his partner Agent Eugene Thomas could view the front door of the Post Office. He exited the vehicle when Defendant exited the Post Office with the two parcels. He and Agent Thomas approached Defendant and Agent Santiago ordered Defendant to drop the packages and grabbed Defendant's wrist, while Agent Thomas grabbed Defendant's other wrist to place him in handcuffs. Agent Santiago testified that he felt the need to detain Defendant using handcuffs because the case involved firearms and there was a likely chance that the person who came to retrieve the firearms would be armed. Agent Santiago did not handcuff Defendant himself. Rather, Agent Thomas attempted to put on the handcuffs, but Defendant was trying to turn around, so another agent, Agent Snowa, approached, and the three of them were able to get the handcuffs on Defendant. Agent Santiago testified that after Defendant was handcuffed, he asked Defendant for his identification and saw a bulge protruding from his front right waistband under his tight-fitting tank top. Agent Santiago stated that he placed his hand on the bulge and immediately felt the handle of a firearm, so he shouted "gun" to alert the other agents. He then removed the gun and attempted to secure it, while Agents Thomas and Snowa did a more thorough search of Defendant's person, including his waistband and pockets, to ensure he did not have another weapon on him. Agent Santiago testified that Defendant was detained, and not free to leave, because he came to pick up the parcels.

The Government's final witness was Special Agent John Snowa of HSI, who also participated in the controlled delivery on May 26, 2021. Agent Snowa testified that he attended

the briefing in the morning and was assigned along with another agent to conduct surveillance from a vehicle along the side of the Frederiksted Post Office. Upon receiving information from Agent Simmonds that an individual was picking up the parcels, they drove to block the entrance of the parking lot to the public roadway to prevent anyone from leaving the parking lot. Agent Snowa testified that he saw the individual with the parcels exit the Post Office and he, Agent Santiago, and Agent Thomas converged on Defendant to detain him. Defendant was told to put the parcels down and Agent Snowa placed his hand on Defendant's elbow and asked Defendant to place his hands behind his back. According to Agent Snowa, Defendant was not resisting, but was being loud and disruptive. Agent Snowa then heard Agent Santiago say "gun" and saw him retrieve a gun from Defendant's waistband. He further testified that Defendant was detained and not free to leave.

     Finally, Defendant testified that he went to his P.O. box on May 26, 2021. He works as a self-employed car mechanic and was expecting car parts from Puerto Rico on that date. Defendant stated that he got two slips in his P.O. box that he expected to be the car parts. Defendant handed the slips to the clerk and when the clerk returned, she called his last name and he took the two parcels. When Defendant exited the Post Office, he saw a car blocking off the road, and people walking toward him. He stated that Agent Thomas took hold of him and turned him around. Defendant then dropped the parcels, and he realized his name was not on the packages. Defendant testified that a female agent came up to him and took $1,000, his wallet, and his keys out of his pockets. Defendant stated that while he was handcuffed an agent lifted Defendant's shirt and pulled a gun off his waist. Defendant further testified that Agent Thomas then threw him to the ground and Agent Santiago put the gun to his head asking Defendant whether he was going to use the gun on the officers. Defendant stated that the agents asked him how he got to the Post Office to which

he stated that his wife had dropped him off to pick up car parts. Then agents put him in a vehicle and drove to a police station where he was placed in a cell. Defendant further testified that he was taken to another room where he was asked to sign a document which he refused to sign. He was then taken back to the cell and released in the evening.

## II. APPLICABLE LEGAL PRINCIPLES

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo,* 500 U.S. 565, 580 (1991)). Evidence obtained as a result of an unreasonable search or seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (requiring exclusion and suppression of evidence obtained as the result of an unlawful search and seizure).

"Generally, a seizure is reasonable only where it is justified by a warrant or probable cause." *Couden v. Duffy*, 446 F.3d 483, 494 (3d Cir. 2006). "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *accord United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002). "The principal components of a determination of . . . probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Probable cause to arrest

"requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Burton*, 288 F.3d at 98 (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995)) (internal quotation marks omitted). Probable cause may exist "even in the absence of the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

Despite the general requirement of probable cause for a seizure, the Supreme Court established in *Terry v. Ohio*, 392 U.S. 1 (1968), that an officer lacking a warrant or probable cause may conduct what is commonly referred to as a "*Terry* stop"—a brief, investigatory stop when the "officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Under the *Terry* test, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted). While a *Terry* stop constitutes a "seizure" and as such is subject to Fourth Amendment protection, *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003), the "intermediate level of intrusion" involved in a *Terry* stop—as opposed to the more serious level of intrusion involved in a full-blown arrest—justifies "allowing police to conduct a limited investigation into the possibility of criminal activity based on reasonable suspicion 'even though there is no probable cause to make an arrest.'" *George v. Rehiel*, 738 F.3d 562, 583 (3d Cir. 2013) (quoting *Adams v. Williams*, 407 U.S. 143, 145-46 (1972)).

In determining the legality of an alleged *Terry* stop, courts determine "whether the officer's

action was justified at its inception"—that is, whether the stop was supported by reasonable suspicion at the outset. *Terry*, 392 U.S. at 20. It is well established that "[r]easonable suspicion is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Because "probable cause means 'a fair probability that contraband or evidence of a crime will be found,' the level of suspicion necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content from that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330).

"A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). However, the police officer must demonstrate that the stop was based on something more than an "inchoate and unparticularized suspicion or hunch." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27) (internal quotation marks omitted). "Reasonable suspicion is an 'elusive concept,' but it unequivocally means that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) ("To meet the reasonable suspicion standard, an officer needs only a minimal level of objective justification. The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." (quoting *Wardlow*, 528 U.S. at 123-24) (internal quotation marks and citation omitted)). "An officer cannot conduct a *Terry* stop simply because criminal activity is afoot. Instead, the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity." *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) (internal citation omitted). In evaluating reasonable suspicion, courts "must consider 'the totality of the

circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *Cortez*, 449 U.S. at 417). Additionally, even if there was reasonable suspicion sufficient to support a *Terry* stop, the stop "may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *Foster*, 891 F.3d at 104 (quoting *United States v. Johnson*, 592 F.3d 442, 451 (3d Cir. 2010)) (internal quotation marks omitted).

In effectuating a *Terry* stop, police cannot "seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983). In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500. "The brief investigative stop allowed under *Terry*, is just that; a brief stop to allow police to investigate. The initial stop does not justify an arrest, prolonged detention, or a stop that lasts any longer than is reasonably necessary to investigate." *United States v. Bey*, 911 F.3d 139, 146-47 (3d Cir. 2018).

Further, the circumstances of a particular investigatory detention may transform an otherwise-valid *Terry* stop supported by reasonable suspicion into a full-blown arrest, which must be supported by probable cause. *Johnson*, 592 F.3d at 447-48. On the other hand, information obtained by law enforcement during a valid *Terry* stop may, in turn, permit the reasonable suspicion supporting the brief investigatory detention to "blossom into probable cause for arrest." *United States v. Navedo*, 694 F.3d 463, 470 (3d Cir. 2012).

"[O]nce the defendant has established a basis for his motion, *i.e.,* the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States*

*v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992).

### III.   DISCUSSION

In the instant Motion to Suppress, Defendant argues that the warrantless search and seizure of his person requires suppression of the physical evidence as well as his subsequent statement as fruit of the poisonous tree. (Dkt. No. 24 at 2). Specifically, he argues that:

> In this case, it is undisputed that Mr. Figueroa was searched and seized by law enforcement without a warrant. Once Mr. Figueroa was seized, agents located a firearm in his waistband during their warrantless search of his person. He was not charged with any crimes related to the parcels. There are no other facts or exceptions to the warrant requirement that would change this constitutional violation. As such, the evidence must be suppressed.

*Id.* at 3-4.

In opposition, the Government argues that Defendant was constitutionally seized pursuant to a valid *Terry* stop. (Dkt. No. 25 at 3-4). The Government argues that law enforcement had a reasonable and articulable suspicion that criminal activity was afoot and that Defendant was involved in that activity given that he had just picked up two parcels which law enforcement knew contained firearms. *Id.* Additionally, given that law enforcement observed the outline of a firearm on Defendant, it was not unreasonable to put Defendant in handcuffs and conduct a pat-down search. *Id.* at 4. Defendant argues that this was not a *Terry* stop but instead a planned arrest that lacked probable cause. (Dkt. No. 39 at 2-3).

The parties do not dispute that when Defendant was approached by several federal agents outside the Post Office, physically restrained, and handcuffed, he was seized. *See United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) ("A seizure occurs when there is either (a) a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful, or (b) submission to a show of authority." (quoting *Brown*, 448 F.3d at 245) (internal quotation marks omitted)). The question then is whether such a seizure constituted a valid *Terry*

11

stop supported by reasonable suspicion or whether it was a *de facto* arrest requiring probable cause. *See Johnson*, 592 F.3d at 447-48 ("In certain circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause.").

The Government argues that the steps taken by law enforcement were permissible as part of a *Terry* stop. (Dkt. No. 38 at 3-4).

During a *Terry* stop, officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985); *see also Terry*, 392 U.S. at 23-24. Therefore, in certain situations, an officer might have to take "necessary measures" to "neutralize the threat of physical harm." *Johnson*, 592 F.3d at 452 (quoting *Terry*, 392 U.S. at 23) (internal quotation marks omitted). Sometimes, placing a defendant in handcuffs is that "necessary measure." *See Foster*, 891 F.3d at 107 ("Placing Payton in handcuffs while confirming that he was not armed and dangerous was not outside the scope of a reasonable *Terry* stop."); *United States v. St. Rose*, 189 F. Supp. 3d 528, 542 n.13 (D.V.I. 2016). Additionally, the use of guns by police does not necessarily transform a *Terry* stop into a *de facto* arrest.[2] *See, e.g.*, *Johnson*, 592 F.3d at 453 (finding that no *de facto* arrest occurred where the police encircled a car, drew their weapons, yelled at the occupants, and handcuffed the suspect); *United States v. Holyfield*, 282 F. App'x 129, 131 (3d Cir. 2008) ("[N]or does the fact that the police officers had their guns drawn convert[] this stop into a *de facto* arrest.").

---

[2] The Court notes that there is conflicting testimony as to whether guns were displayed or used in the process of detaining Defendant.

It is undisputed, however, that after Defendant was handcuffed, he was put into a vehicle and transported to the HSI office. Defendant testified that when he arrived at the HSI office he was placed in a cell and then interviewed for approximately 40 minutes to an hour. The Third Circuit has noted that "[d]epending on the facts, involuntary transportation to a police station or other custodial setting can be deemed a de facto arrest." *United States v. Wrensford*, 866 F.3d 76, 85 (3d Cir. 2017). There was no testimony or argument from the Government as to why the agents' actions in transporting Defendant to the HSI office would be permissible or necessary pursuant to a *Terry* stop. *See Wrensford*, 866 F.3d at 87 ("[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention . . . . The record, however, does not indicate that [defendant] was moved from the street and detained in a cell out of a concern for the officers' or the public's safety or security." (internal quotation marks and citation omitted)). Indeed, instead of a legitimate basis for the transportation within the scope of the *Terry* stop, the Government simply concedes that Defendant "was later subjected to a *de facto* arrest when he was transported from the scene of the post office to the HSI office." (Dkt. No. 38 at 4). Thus, whether or not the initial detention was within the bounds of *Terry*, the Court finds that Defendant was at least subject to a *de facto* arrest when he was involuntarily transported from the Post Office to the HSI office and placed in a cell.[3] *See Wrensford*, 866 F.3d at 87; *United*

---

[3] As to the Government's argument that the initial detention prior to the transportation of Defendant was proper pursuant to a *Terry* stop (Dkt. No. 38 at 3-4), the Court notes that a *Terry* stop must be "tailored by police to 'diligently pursue[] *a means of investigation* that [is] likely to confirm or dispel their suspicions quickly.'" *Foster*, 891 F.3d at 106 (quoting *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985)) (emphasis added). Thus, when evaluating the propriety of a *Terry* stop, the Supreme Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685. There is no evidence on the record regarding what investigative methods law enforcement intended to employ when stopping Defendant to confirm or dispel their suspicions of criminal activity. Indeed, Defendant was simply stopped, handcuffed, searched, and then immediately put into the police vehicle for transport. There is no testimony about any attempt

*States v. Davis*, Criminal Action No. 2017-0038-01, 2020 U.S. Dist. LEXIS 117928, at *29-30 (D.V.I. July 6, 2020).

The Government states that no probable cause existed at the time Defendant was seized. However, the Court disagrees with the Government's evaluation of the issue and finds that the officers had probable cause to arrest Defendant from the outset of the seizure. *See Burton*, 288 F.3d at 97-98 (finding the police had probable cause despite the government arguing that the seizure was only justified under *Terry*).

In this case, law enforcement conducted a controlled delivery of illegally shipped firearms. A controlled delivery has been described by the Supreme Court as follows:

> The lawful discovery by common carriers or customs officers of contraband in transit presents law enforcement authorities with an opportunity to identify and prosecute the person or persons responsible for the movement of the contraband. To accomplish this, the police, rather than simply seizing the contraband and destroying it, make a so-called controlled delivery of the container to its consignee, allowing the container to continue its journey to the destination contemplated by the parties. The person dealing in the contraband can then be identified upon taking possession of and asserting dominion over the container.

*Ill. v. Andreas*, 463 U.S. 765, 769 (1983). This is exactly what occurred here. Testimony at the suppression hearing established that law enforcement intercepted two separate parcels containing firearms and addressed to Defendant's P.O. box. Law enforcement removed the firearms from the parcels for safety purposes and allowed the parcels to continue on their journey. They confirmed that the P.O. box was registered to a person with the name Moises Figueroa. They then surveilled

---

to question Defendant regarding the firearms, any attempt to employ any other investigatory method, or any explanation as to why law enforcement felt the need to transport Defendant at that point in the interaction. Thus, it is difficult for the Court to evaluate whether the alleged *Terry* stop was "tailored by police" or whether they "diligently pursue[d] a means of investigation that [was] likely to confirm or dispel their suspicions quickly." *Foster*, 891 F.3d 106. However, because the Court finds that the stop was supported from the outset by probable cause, the Court need not address the issue.

the Post Office and witnessed Defendant enter and pick up the two parcels. Only after Defendant exited the Post Office with the parcels did law enforcement officers intercede and seize Defendant.

The Court finds that the Third Circuit opinion in *United States v. Glasser*, 750 F.2d 1197 (3d Cir. 1984), is instructive in evaluating probable cause in the context of a controlled delivery. In *Glasser*, after two wooden heads in the mail were discovered to contain hashish oil, the DEA arranged for a controlled delivery of the packages. 750 F.2d at 1199. A package was delivered to the house of the addressee and shortly after, one defendant, Leonard Steven Gaza, was seen going into the house. *Id.* at 1200. Five minutes after he arrived, a DEA agent witnessed Gaza exit the house with a brown package and he was then arrested in the driveway. *Id.* Gaza argued that his warrantless arrest was not supported by probable cause. *Id.* at 1205. The Third Circuit found these facts supported probable cause to arrest Gaza as the agents were aware that the package contained contraband and were expecting someone to pick up the package:

> A little more than an hour after the package was delivered, Gaza appeared at Glasser's home. He entered the home empty-handed. He left the house five to ten minutes later carrying what appeared to be a "brown package." Although, in fact, Gaza carried the wooden head in a brown bag, not in the original control package as the DEA agent mistakenly believed, this understandable error does not negate the objective facts giving rise to probable cause. Obviously, Gaza had taken something from the house. In light of the proximity in time with the delivery of the hashish oil and the brevity of his stay in the house, there was a very strong probability that he was leaving with the hashish oil. The size, shape and appearance of the brown bag . . . were clearly consistent with the belief that it contained the wooden head.

*Id.* at 1206.[4]

---

[4] In addition to providing probable cause to arrest suspects, controlled deliveries of contraband to residences are often used as the basis for probable cause for anticipatory search warrants. *See United States v. Grubbs*, 547 U.S. 90, 97 (2006) ("[T]he occurrence of the triggering condition—successful delivery of the videotape to Grubbs' residence—would plainly establish probable cause for the search."); *United States v. Loy*, 191 F.3d 360, 365 (3d Cir. 1999) ("Where the warrant application indicates that there will be a controlled delivery of contraband to the place to be searched, the nexus requirement of probable cause is usually satisfied.").

Similar to *Glasser*, in the instant matter, the parcels containing the illegally shipped firearms were sent to a P.O. box registered in Defendant's name. Law enforcement conducted surveillance and witnessed Defendant pick up the parcels and walk out of the Post Office with them. Under these circumstances, it is reasonable to believe that Defendant who came to retrieve the parcels was involved in the two packages of illicit firearms sent to his P.O. box. *See Johnson v. United States*, 40 A.3d 1, 9 (D.C. 2012) (noting that in a controlled delivery situation it is "a reasonable inference that the *sender* would not entrust contraband that is valuable, with the attendant risk of exposing the sender to criminal liability, to an unknown, unsuspecting person"). Thus, the Court concludes that these facts provided law enforcement with probable cause to arrest Defendant. *See Glasser*, 750 F.2d at 1206; *United States v. Armstrong*, 69 F. App'x 509, 511-12 (3d Cir. 2003) (finding probable cause after "Armstrong arrived at Dillard's residence seven minutes after the controlled delivery of one of the packages [containing drugs]. The package was opened while Armstrong was in Dillard's home. Entering the home, inspectors found Armstrong upstairs in close proximity to Dillard and the open package."); *Spencer v. Connecticut*, 560 F. Supp. 2d 153, 162 (D. Conn. 2008) ("During a 'controlled delivery,' the Plaintiff, in full view of the police, accepted, took possession of, and placed in his residence a parcel containing a significant amount of marijuana. This was sufficient to allow the police to believe that the Plaintiff had committed a crime . . . . Thus, in the court's view, the police had probable cause to arrest the Plaintiff . . . .").

Defendant argues that "an objectively reasonable officer could have easily concluded that Mr. Figueroa as the owner of the post office box, was simply picking up car parts or some other legitimate package." (Dkt No. 39 at 4). However, as noted by the Third Circuit in *Glasser*, "[w]hile there existed at the time some theoretical possibility that Gaza was retrieving some other innocent

item in a brown bag from the Glasser residence, the probable cause standard 'does not deal with hard certainties, but with probabilities.'" *Glasser*, 750 F.2d at 1206 (quoting *Gates*, 462 U.S. at 231). Thus, the fact that Defendant *could* have been participating in innocent activity does not negate the reasonable conclusion that Defendant was engaging in criminal activity.

Defendant further argues that he was not charged with any crimes related to the firearms in the parcels and that ultimately "[a]gents believed [him]" when "he denied knowledge of the contents of the parcels." (Dkt. No. 24 at 2). However, the determination of probable cause is made based on the information that existed at the time of the arrest. *See Halsey v. Pfeiffer*, 750 F.3d 273, 299 (3d Cir. 2014) ("It is therefore irrelevant in a probable cause inquiry whether a person is later acquitted of the crime for which she or he was arrested." (internal quotation marks and citation omitted)); *Myers*, 308 F.3d at 255 ("[T]he determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the court to determine whether the objective facts available to the officers *at the time of arrest* were sufficient to justify a reasonable belief that an offense was being committed." (quoting *Glasser*, 750 F.2d at 1206) (emphasis added)). Therefore, the fact that agents may have determined later that Defendant was not involved in the shipment of firearms would not negate the probable cause based on the suspected firearm trafficking that existed at the time of the seizure.[5]

---

[5] Additionally, whether or not the agents in this situation believed they were conducting an arrest or an investigatory detention, their subjective believe is not relevant to the Court's determination of probable cause. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); *United States v. Donahue*, 764 F.3d 293, 302 (3d Cir. 2014) (noting that "our probable cause inquiry is entirely objective" and "subjective belief may be relevant in a probable cause inquiry to the extent that it reveals facts material to a probable cause determination"); *Myers*, 308 F.3d at 255 ("It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being

Because the Court concludes that law enforcement in this case had probable cause to arrest Defendant, the Court need not decide whether aspects of the seizure exceeded the bounds of a *Terry* stop. *See Burton*, 288 F.3d at 97-98 ("Given our finding that the police had probable cause [to arrest the defendant], we have no reason to decide whether the Task Force acted permissibly under *Terry*."). Instead, given the existence of probable cause, the Court concludes that law enforcement officers were permitted to arrest Defendant. *See Glasser*, 750 F.2d at 1205 ("It is well established that probable cause for a warrantless arrest exists when, at the time of the arrest, the facts and circumstances within the officer's knowledge are 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" (quoting *Beck*, 379 U.S. at 91)); *Florida v. White*, 526 U.S. 559, 565 (1999) ("[T]he Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred."); *Burton*, 288 F.3d at 98 ("Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony." (quoting *United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992)) (internal quotation marks omitted)). Thus, Defendant's argument that his warrantless seizure violated the Fourth Amendment fails.

With regard to the search of Defendant's person, the evidence presented at the suppression hearing shows that law enforcement performed a search of Defendant after putting him in handcuffs. The Government again argues that it was reasonable to conduct a pat-down search of Defendant as a part of the alleged *Terry* stop. (Dkt. No. 25 at 4).

---

committed." (quoting *Glasser*, 750 F.2d at 1206)); *United States v. Leal*, 235 F. App'x 937, 939 (3d Cir. 2007) ("Law enforcement officers have broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justifications for their actions if the legal justification is objectively grounded.").

18

Agent Santiago testified that after Defendant was handcuffed, Agent Santiago saw a bulge protruding from Defendant's front right waistband. Agent Santiago testified that he could see the bulge protruding from under Defendant's tight-fitting white tank top and that he immediately felt the handle of a firearm when he placed his hand on the bulge. He then lifted Defendant's shirt and retrieved the firearm. Additionally, Agent Santiago testified that after he removed the firearm from Defendant's person, other agents "performed a more thorough search" as a part of their normal practice, wherein they "search [the suspect's] waistband, pockets, generally any area that's accessible to the hands." Defendant also testified that an officer went through his pockets and took out his money, wallet, and keys.

The Court agrees with the Government that during a *Terry* stop, police officers are permitted to "perform a limited protective 'patdown' for weapons during that detention." *Navedo*, 694 F.3d at 467 (quoting *Terry*, 392 U.S. at 30). However, as noted above, because the Court has found that law enforcement had probable cause to arrest Defendant when they seized him, the Court need not decide whether the search of Defendant falls within the scope permitted under *Terry*. *See Burton*, 288 F.3d at 97-98. Instead, Defendant could be frisked pursuant to a search incident to arrest. *See Glasser*, 750 F.2d at 1206 ("Since there was probable cause to arrest Gaza, the seizure of the brown bag containing hashish oil was valid as the result of a search incident to a lawful arrest.").

Pursuant to this exception to the warrant requirement "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *United States v. Shakir*, 616 F.3d 315, 317 (3d Cir. 2010) (quoting *Chimel v. California*, 395 U.S. 752, 762-63 (1969)) (internal quotation marks omitted). "The permissible scope of a search incident to arrest includes

the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* (quoting *Chimel*, 395 U.S. at 763) (internal quotation marks omitted).

In this matter, the search of Defendant was limited to Defendant's person, specifically his waistband and pockets where he could reach for weapons. The Court finds such a search of Defendant's person falls squarely within the proper scope of a search incident to arrest. *See Shakir*, 616 F.3d at 317; *United States v. Mosley*, 805 F. App'x 164, 166 (3d Cir. 2020) ("By the time of that search, the officers had determined that Mosley possessed marijuana and that he had a handgun without a permit. The officers therefore had probable cause to arrest Mosley and to search his person incident to that arrest.").

## IV. CONCLUSION

For the reasons discussed above, the Court finds that Defendant's Fourth Amendment rights were not violated. Accordingly, the Court will deny Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date: September 12, 2022 _____/s/_____
WILMA A. LEWIS
District Judge